Cheryl SCHLETT, et al., Plaintiffs,

v.

AVCO FINANCIAL SERVICES, INC., et al., Defendants.

No. 3:95 CV 7117.

United States District Court, N.D. Ohio, Western Division.

Oct. 17, 1996.

William H. Bartle, W. Patrick Murray, Murray & Murray, Sandusky, OH, for Cheryl Schlett, Douglas Schlett, Samuel Schlett.

Gregory V. Mersol, Thomas R. Simmons, Arter & Hadden, Cleveland, OH, for Avco

Financial Services, Inc., Benefits Committee of Avco Financial Services, Inc.

## MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Defendant's motion for summary judgment and Plaintiff's cross-motion for partial summary judgment. For the following reasons, Defendant's motion will be granted. Plaintiff's motion will be denied.

### I. BACKGROUND

Plaintiffs brought this action against Plaintiff Cheryl Schlett's former employer, alleging discrimination on the basis of pregnancy, and violations of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. §§ 2601 et seq., the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1131 et seq., and the Consolidated Omnibus Budget Reconciliation Act ("COBRA") amendments to ERISA codified at 29 U.S.C. §§ 1161 et seq.

Plaintiff Cheryl Schlett ("Schlett") was hired as a part-time customer service representative by Defendant Avco Financial Services, Inc. ("Avco") on March 24, 1993. At the time of Schlett's hire, Avco employed three full-time employees in its Sandusky, Ohio office; Schlett was the fourth employee.

Avco's company policy prescribes a staffing limit requiring that the office service at least 350 accounts per employee. In June, 1993, the Sandusky office where Schlett worked had 1,398 accounts, two short of the number required to justify four full-time employees. Schlett was converted to full-time employment status, however, because the branch manager needed additional assistance in converting the office to a new computer system.

Schlett learned that she was pregnant in August, 1993, and informed her branch manager of her pregnancy in September, 1993.

Between June, 1993 and December, 1993, the number of accounts in the Sandusky office dropped to 1,236, an average of only 309 accounts per employee. The new computer system was fully implemented by November, 1993.

In December, 1993, district manager James Shake informed Schlett that she would be converted back to part-time status because of the decline in the number of accounts. Since Avco provides health care coverage only for full-time employees, the conversion to part-time status would result in the loss of Schlett's medical benefits. At that time, Shake asked Schlett if she expected Avco to pay for her pregnancy and if she were covered under her husband's group health plan. Schlett informed Shake that she was covered under her husband's policy, but intended to keep dual coverage under both plans.

Schlett was reduced to part-time status effective January 1, 1994. She was provided a COBRA election form on January 7, 1994. At some time around January, 1994, branch manager Irene Phipps called Avco's home office in an unsuccessful attempt to allow Schlett to keep her medical benefits. Schlett attempted to elect COBRA benefits on or about February 24, 1994. Avco denied Schlett's request on the ground that she was ineligible for COBRA benefits because she was already covered by other group health coverage.

On February 17, 1994, Schlett gave birth prematurely. Schlett's son, Plaintiff Samuel Schlett, was in the hospital for two months and incurred medical bills of approximately $130,000. Schlett's husband's medical benefits covered approximately $117,500 of that amount, leaving Plaintiffs personally liable for the remaining $12,500.

Shortly after her son was born, Schlett informed Avco that she did not know whether she would be able to return to work because her son was still in the hospital. In April, 1994, she again informed Avco that she had no idea when she would be able to return to work. Avco terminated Schlett effective April 15, 1994.

Schlett, along with her husband and son, brought suit in this Court on numerous claims arising out of her reduction to part-time status, denial of medical benefits, and termination by Avco. In Counts I and II of her amended complaint, they allege that Avco discriminated against Schlett on the

basis of her pregnancy in violation of Title VII of the Civil Rights Act of 1964 and Ohio Rev.Code §§ 4112.02 & 4112.99. In Counts III and IV, they allege that Avco denied Schlett and her son continued medical insurance benefits in violation of ERISA and CO-BRA. In Count V, they bring a state claim for promissory estoppel. In Count VI, they allege intentional interference with ERISA benefits in violation of 29 U.S.C. § 1140. In Count VII, they allege violations of the Family and Medical Leave Act.

Defendants have moved for summary judgment on all Counts. The Court discusses the parties' contentions below.

## II. DISCUSSION

### A. Summary Judgment Standard

As an initial matter, the Court sets forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Of course, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. at 2553. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (*quoting* Fed.R.Civ.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356,

89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

### B. Pregnancy Discrimination

Plaintiffs allege that Schlett was reduced to part-time status, and ultimately terminated, because of her pregnancy. Discrimination on the basis of pregnancy is gender discrimination forbidden under both federal and state law. 42 U.S.C. § 2000e(k); Ohio Rev.Code § 4112.02(A); *Frank v. Toledo Hosp.*, 84 Ohio App.3d 610, 617 N.E.2d 774 (1992).

Defendants deny that Schlett was reduced to part-time status or terminated because of her pregnancy. They allege that Schlett was reduced to part-time status because of a downturn in the company's sales volume, and that she was terminated because she did not give a date on which she could return to work.

The employee carries the initial burden of establishing a prima facie case of gender discrimination in employment. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). An employee establishes a prima facie case of gender discrimination by presenting evidence which, when viewed in the light most favorable to her, would permit a reasonable jury to find that she was discharged or demoted because of her gender. *See Rose v. National Cash Register Corp.*, 703 F.2d 225, 227 (6th Cir.), *cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983).

A plaintiff can meet this burden by presenting either direct or circumstantial evidence of discrimination. *Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246

(6th Cir.1995). Direct evidence is found, for instance, where an employer's policy is discriminatory on its face, *see Trans World Airlines, Inc., v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985), or where a statement or written memorandum shows discriminatory motive on its face, *Vaughn v. Edel,* 918 F.2d 517, 521 (5th Cir. 1990). Once a plaintiff shows that gender played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even had it not been motivated by gender discrimination. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–45, 109 S.Ct. 1775, 1787–88, 104 L.Ed.2d 268 (1989) (plurality opinion).

■ Where no direct evidence of discrimination exists, an employee can establish her prima facie case by indirect or circumstantial evidence. In that instance, she must show (1) that she is a member of the protected class; (2) that she was subjected to adverse employment action; (3) that she was qualified for the position sought, or that she was meeting her employer's reasonable expectations; and (4) that she was replaced by an employee outside the protected class. *See McDonnell Douglas Corp.,* 411 U.S. at 802, 93 S.Ct. at 1824; *Talley,* 61 F.3d at 1246; *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 582 (6th Cir.1992). In a reduction-in-force case, or where the employee is not replaced, she can meet the fourth prong by showing that she was discharged because of her gender. *See Easterwood v. Racetrac Petroleum, Inc.,* No. 93–6032, 1994 WL 718546, at *3 (6th Cir. Dec. 28, 1994). Where the plaintiff presents only circumstantial evidence of discrimination, the burden of production then "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse action *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Once the employer has met its burden, the burden shifts back to the employee to show that the employer's stated reason for the adverse action is pretextual. *Id.* at 804, 93 S.Ct. at 1825. In circumstantial evidence cases, the burden of persuasion remains at all times with the employee. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 506–10, 113 S.Ct. 2742, 2747–48, 125 L.Ed.2d 407 (1993).

### 1. Direct Evidence of Discrimination

■ Plaintiffs allege that they have produced direct evidence of gender discrimination by showing that district manager Shake asked Schlett if she expected Avco to pay for her pregnancy, and that branch manager Irene Phipps told Schlett that she could not remember anyone taking maternity leave in her thirty years with Avco.

The Court disagrees. In the first place, neither remark is discriminatory on its face. In the context of the expected elimination of Schlett's medical benefits, Shake's question to Schlett concerning whether she would be covered for an anticipated medical expense was natural and expected. Phipps' statement regarding maternity leave demonstrates nothing more than that one employee working in a three-person office was unfamiliar with corporate maternity leave procedures; it is evident from Phipps' deposition that she personally knew of women in other branch offices who had taken maternity leave and returned to work without incident.

Furthermore, even if a reasonable jury could find one or both of the above remarks to be facially discriminatory, the Sixth Circuit and United States District Courts in Ohio have consistently held that isolated and ambiguous discriminatory remarks are insufficient to overcome a motion for summary judgment. *See, e.g., Phelps v. Yale Security, Inc.,* 986 F.2d 1020, 1025–26 (6th Cir.), *cert. denied,* 510 U.S. 861, 114 S.Ct. 175, 126 L.Ed.2d 135 (1993); *Gagné v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir. 1989); *Chappell v. GTE Products Corp.,* 803 F.2d 261, 268 n. 2 (6th Cir.1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1375, 94 L.Ed.2d 690 (1987). Plaintiffs have not presented sufficient direct evidence to establish a prima facie case of discrimination.

### 2. Indirect Evidence of Discrimination

Even if she cannot show direct evidence of discrimination, a plaintiff can establish a prima facie case of discrimination by circumstantial evidence. In this case, the parties do not dispute that Schlett (1) is a member of

the protected class; (2) was subjected to adverse employment action; and (3) was meeting her employer's reasonable expectations. They disagree as to whether Plaintiffs can show that Schlett was reduced to part-time status and then discharged because of her gender. Plaintiffs can meet the final prong of the test by showing (a) that a similarly situated person outside the protected class received better treatment; and (b) that sufficient evidence exists from which the factfinder can find a causal connection between Schlett's sex and the dissimilar treatment. *See Cooper v. City of North Olmsted,* 795 F.2d 1265, 1270 (6th Cir.1986).

Plaintiffs allege that administrative assistant Phyllis Mesenberg, who succeeded to the position created from the two positions formerly held by both Schlett and Mesenberg, is a similarly situated person outside the protected class who received better treatment than Schlett. Defendants respond that Mesenberg is not similarly situated, and that no evidence exists from which a reasonable jury can find a causal connection between Schlett's pregnancy and the dissimilar treatment.

■ With regard to the cutback from full-time to part-time employment, the Court finds that Schlett and Mesenberg were similarly situated. Both employees performed essentially the same duties. Both were meeting the employer's reasonable expectations. Although Mesenberg had ten years of seniority, while Schlett did not, a reasonable jury could believe on the evidence presently in the record that Avco's policy was to base its termination decisions on ability and performance, rather than tenure.[1]

■ Plaintiffs have not, however, presented any evidence from which a reasonable jury could find a causal connection between Schlett's pregnancy and the dissimilar treatment. They improperly attempt to shift their burden of production to Defendants by resting on the assertion that "there is no explanation offered by defendants why the demotion and reduction fell upon the shoulders of Cheryl Schlett." They forget that in

the absence of positive evidence of a nexus between Schlett's pregnancy and her reduction to part-time status, Defendants have no obligation to provide such an explanation. The deposition testimony in the record does not indicate that Plaintiffs ever asked any Avco decisionmaker to explain why Schlett's hours, rather than Mesenberg's, were reduced. They cannot now rely on the absence of such explanation to overcome Defendants' motion for summary judgment. Plaintiffs cannot meet the fourth prong of the test on the issue of reduction in hours.

■ With regard to the termination, the Court finds that Schlett and Mesenberg were not similarly situated. The parties agree that Schlett took an indefinite leave of absence, while Mesenberg did not. Since Schlett and Mesenberg were not similarly situated, Plaintiffs cannot meet the fourth prong of the test on the issue of termination.

### 3. *Summary*

Plaintiffs have failed to establish a prima facie case of discrimination, by either direct or indirect evidence. Accordingly, Defendants' motion for summary judgment on Counts I and II must be granted.

### C. *Denial of Health Insurance Benefits*

■ Plaintiffs allege that Avco denied Schlett continued medical insurance benefits in violation of ERISA and COBRA. Defendants deny that the denial of continued medical insurance benefits violated ERISA or COBRA. They allege that Schlett was ineligible for the continuing benefits she applied for because she was covered under her husband's health insurance.

### 1. *Extent of Right to Continued Coverage*

The coverage issue raised by the parties appears to be a question of first impression in this Circuit. ERISA, as amended by COBRA, requires employers to offer beneficiaries of their health plans the right to elect continued coverage, when those benefits

---

1. Robert Fine testified that Avco's policy was to base its promotion decisions on ability and performance, rather than tenure, whenever possible.

He stated that he did not know whether that same policy applied to reduction-in-force terminations.

would otherwise be lost because of termination or reduction of hours. 29 U.S.C. §§ 1161, 1163(2). The beneficiary's right to continue that coverage ends on the date on which he or she "first becomes, after the date of election, covered under any other group health plan . . . 'which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary.'" 29 U.S.C. § 1162(2)(D). The Sixth Circuit has never addressed the issue of whether the statutory language authorizes an employer to withhold continuation coverage when the departing employee has dual coverage under her spouse's health insurance plan throughout her employment and therefore has a continuing source of coverage when she becomes ineligible for benefits. Other Circuit Courts have come to different conclusions on that issue.

The Tenth Circuit first addressed the dual coverage issue in *Oakley v. City of Longmont*, 890 F.2d 1128 (10th Cir.1989), *cert. denied*, 494 U.S. 1082, 110 S.Ct. 1814, 108 L.Ed.2d 944 (1990). The statute under which *Oakley* was decided stated that continuation coverage ended on the date on which "the qualified employee first becomes, after the date of election, covered under any other group health plan." 42 U.S.C. § 300bb–2(2)(D)(i) (1988).[2] Oakley suffered a permanent head injury in an automobile collision with a drunk driver, and was subsequently terminated because of his inability to return to work. At the time of Oakley's termination, he was covered both by his employer's health plan and as a dependent under his wife's plan. His employer informed him that he was ineligible for continuation coverage because he was covered by his wife's plan. However, his wife's plan, unlike his own plan, did not cover the costs of his medical treatment.

The Tenth Circuit held that the statute did not provide a basis for terminating coverage. In construing the statutory language, the Court focused on the phrase "after the date of election," and held that the plain meaning of the section could not "be construed to include a spouse's preexisting group plan as

a condition to terminate continuation coverage." *Oakley*, 890 F.2d at 1132. The Court went on to explain that:

> Surely the facts of this case illustrate the precise gap in coverage which troubled Congress. Mr. Oakley was terminated because of a catastrophic event which otherwise would have put his family at risk and jeopardized his treatment had the continuation rules not been in effect to maintain his rehabilitation for a limited period of time.

*Id.* at 1133.

Ten days after the *Oakley* decision was rendered, Congress amended ERISA's continuation coverage provisions to provide that the right to such continuation coverage ends on the date the employee becomes covered under another group health plan "*which does not contain any exclusion or limitation with respect to any preexisting condition.*" 29 U.S.C. § 1162(2)(D)(i) (emphasis added). The House Report accompanying the legislation explained that the amendment was:

> intended to carry out the purpose of the health care continuation rules, which *was to reduce the extent to which certain events, such as the loss of one's job, could create a significant gap in health coverage.* Such a gap in coverage occurs when the new employer group health coverage excludes or limits coverage for a preexisting condition that is covered by the continuation coverage.

H.R.Rep. No. 247, 101st Cong., 1st Sess. 1453 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2923 (emphasis added).

The Fifth Circuit construed the new statute in *Brock v. Primedica, Inc.*, 904 F.2d 295 (5th Cir.1990), and held that a voluntarily terminated employee who had dual coverage under her husband's health plan was not entitled to continue her benefits under COBRA, as long as she did not suffer a gap in the character of her coverage as the result of her termination. That Circuit based its holding both on the legislative history of the statute at issue, and on *dicta* in the *Oakley* opinion expressing concern about the gap in

---

**2.** Since Oakley was a public employee, his case arose under the Public Health Service Act, rather than ERISA. The continuation coverage provisions of the two laws are identical.

coverage experienced by that plaintiff. *Id.* at 297.

The provision at issue was next construed by the Eleventh Circuit in *National Cos. Health Benefit Plan v. St. Joseph's Hosp. of Atlanta, Inc.,* 929 F.2d 1558 (11th Cir.1991). That Circuit joined the Fifth Circuit in holding that coverage under a preexisting group health plan terminated the plaintiff's former employer's obligation to provide continuation coverage. It rejected the Tenth Circuit's emphasis on the "becomes, after the date of election" language in the statute, and held that the true issue the Court should address was whether Congress' purpose—employee group health coverage—had been served. Thus, under the Eleventh Circuit's reasoning:

> it is immaterial when the employee obtains other group coverage; the only relevant question is when, after the election date, does that other coverage take effect. In the case of an employee covered by preexisting group health coverage, the terminating event occurs immediately; the first time after the election date that the employee becomes covered by a group health plan other than the employer's plan is the moment after the election date. In effect, such an employee is ineligible for continuation coverage.

*Id.* at 1570.

The Court went on to hold that an employee with dual coverage may be entitled to continuation coverage if there is a significant gap between the coverage afforded under the employer's plan and the coverage afforded under the preexisting dual plan.

> This is because, in that situation, the employee is not truly "covered" by the preexisting group health plan ... the employee, despite his other coverage, will be liable personally for substantial medical expenses to his and his family's detriment. Denying continuation coverage in that setting would serve to frustrate, rather than foster, Congress' clear intentions.

*Id.* at 1571.

The Eighth Circuit decided a claim presenting an analogous issue on different grounds in *McGee v. Funderburg,* 17 F.3d 1122 (8th Cir.1994), but *dicta* in that opinion indicates that the Eighth Circuit would have adopted the "significant gap" position of the Fifth and Eleventh Circuits if resolution of the issue had been necessary to its decision.

Finally, in *Lutheran Hospital of Indiana, Inc. v. Business Men's Assurance Co. of Am.,* 51 F.3d 1308 (7th Cir.1995), the Seventh Circuit, in a 2–1 decision, came down on the side of finding a right to continued coverage even if the employee is already covered under a spouse's health plan. In that case, a gap in coverage between the plaintiff's plan and her husband's dual coverage left the plaintiff personally liable for medical bills of $35,000. Although the Court colorably could have ruled in the plaintiff's favor under a "significant gap" analysis, they expressly declined to do so. Like the Tenth Circuit, they focused on the phrase *"becomes, after* the date of election," and held that "an employee loses the right to continuation coverage only if he or she chooses after the election date to accept coverage under another group health plan." *Id.* at 1312.

Judge Coffey, in dissent, argued that the majority opinion "places more importance on grammar and syntax than on Congress' clear intent in enacting COBRA and its subsequent amendments.... COBRA insurance is not, nor has it ever been intended to provide adjunct or double health insurance coverage for those who are covered under another pre-existing policy." *Id.* at 1315 (Coffey, J. dissenting).

District Courts in other jurisdictions have almost universally adopted the view of the Fifth and Eleventh Circuits. *See, e.g., Geissal v. Moore Medical Corp.,* 927 F.Supp. 352, 358 (E.D.Mo.1996); *Liberty Life Assurance Co. of Boston v. Toys "R" Us, Inc.,* 901 F.Supp. 556, 564 (E.D.N.Y.1995). This Court agrees with that view. The purpose of statutory interpretation is to effectuate the legislature's intent, not to engage in an academic sentence-parsing exercise. Congressional intent as to this issue is clear: the purpose of the health care continuation rules is "to reduce the extent to which certain events, such as the loss of one's job, could create a significant gap in health coverage." H.R.Rep. No. 247, 101st Cong., 1st Sess.

1453 (1989), *reprinted in* 1989 U.S.C.C.A.N. 1906, 2923. That legislative policy compels the rule that only a beneficiary whose loss of benefits would result in a significant gap in coverage has a right to continuation coverage.

Since Schlett was covered by her husband's health plan, she has a right to continuation coverage only if, because of a significant gap between the coverage afforded under the Avco plan and the coverage afforded under her husband's plan, she is not truly "covered" by the other health plan. The Court, therefore, addresses the issue of whether there is a significant gap between the two plans.

### 2. *Significant Gap*

Plaintiffs allege that there is a significant gap in the relative amounts of coverage offered by the two plans. The insurance provided by Schlett's husband's plan left Plaintiffs personally liable for $12,500. Plaintiffs calculate that they would have incurred no personal liability had double coverage been available.

Plaintiffs have not calculated the amount of personal liability they would have incurred under the Avco plan alone. That plan has a family coinsurance limit of $3,000 each year, and Plaintiffs would have been responsible for premiums of $502/month in order to continue their coverage. Therefore, Plaintiffs, had they been allowed to continue their COBRA benefits, would have incurred expenses of $3,000 plus $502 times the number of months Plaintiffs would have paid for the coverage.

The parties have not indicated in their briefs the time periods over which Samuel Schlett incurred his medical bills, except to say that he was hospitalized until at least mid–April, 1994. Since the Court, on a motion for summary judgment, views the evidence in the light most favorable to the nonmovant, it will assume for purposes of this motion that Samuel Schlett incurred all his medical expenses by the end of April, 1994, and that Plaintiffs would not have kept

COBRA benefits beyond that time. Under this extremely conservative estimate, Plaintiffs would have been out of pocket about $5,000 for medical expenses.[3]

| | |
|---|---|
| $3,000 | family cap |
| $2,008 | four months of premiums |
| $5,008 | |

Thus, the coverage gap between the Avco plan and Schlett's husband's plan can be at most about $7,500.

### a. *What Constitutes a Significant Gap?*

The parties have taken widely divergent positions on the test the Court should use in determining whether the $7,500 gap is significant. Their positions reflect, to some extent, the unsettled nature of this area of law.

The restrictive test uses the literal language of the statute to limit continuation coverage to only those circumstances when the preexisting plan contains a exclusion or limitation with respect to a preexisting condition of the beneficiary, *see* 29 U.S.C. § 1162(2)(D). Defendants urge the Court to adopt this test, and then to engraft onto that limitation a further restriction that the gap at issue result from such exclusion or limitation.

The broader test asks only whether the coverage provided by the preexisting health plan is less comprehensive than the coverage provided under the employer's plan, regardless of the reason for the gap. The Court looks not only at preexisting condition exclusions, but also evaluates the benefits offered, including deductibles, co-payments and coverage caps, with a view to the treatment the beneficiary may foreseeably require. This test is based on the policy behind the statute as reflected in its legislative history, and on the principle that where the alternate plan is less comprehensive, "the employee is not truly 'covered' by the preexisting group health plan ... the employee, despite his other coverage, will be liable personally for substantial medical expenses to his and his family's detriment." *National Cos.*, 929 F.2d at 1571. Plaintiffs urge the Court to adopt the

---

**3.** In fact, Schlett indicates in her deposition that she would have continued her COBRA benefits indefinitely. Had the Court used a more realistic

eighteen-month premium payment period, the benefit gap would have disappeared entirely.

broader test, and then to hold, with the benefit of hindsight, that the $7,000 gap in coverage is significant.

Neither of these extremes represents the modern trend in continuation coverage cases. District Courts addressing the issue in recent years have generally followed the broader test, holding that a significant gap exists when coverage is excluded or limited for certain types of conditions or treatments. *Geissal,* 927 F.Supp. at 359; *Taylor v. Kawneer Co. Comprehensive Medical Expense Plan for Salaried Employees,* 898 F.Supp. 667, 678 (W.D.Ark.1995). However, the policy comparison "must be made without benefit of hindsight. The court must look to the difference in the policies at the time of election." *Daniel v. Master Health Plan, Inc.,* 864 F.Supp. 1399, 1406 (S.D.Ga.1994) (internal quote and citation omitted), *rev'd in part, vacated in part,* No. 94–9362, 86 F.3d 1169 (11th Cir. May 24, 1996).

■ While some precedent exists for the two positions advocated by the parties, *see, e.g., Liberty Life,* 901 F.Supp. at 564 (gap must result from a preexisting condition exclusion in the spouse's medical plan); *McGee,* 17 F.3d at 1126 (in dicta, significant gap occurs whenever the employee incurs significant personal liability he would not have incurred under the employer's plan), the Court finds the modern trend to be the better reasoned approach. The position advocated by Defendants suffers from the same defect that led this Court to reject the rule of the Seventh and Tenth Circuits: it invites the Court to engage in syntactic games, rather than to effectuate Congress' intent of reducing the extent to which the loss of a job can create a significant gap in health coverage. The *post hoc* position advocated by Plaintiffs, on the other hand, subjects the employer to an unacceptable degree of uncertainty as to its legal obligations. The employer determines whether it must offer continuation coverage when the original coverage ceases. Whether such determination was reasonable must be adjudged on the basis of the information available to the employer at the time of decision, rather than being subject to *ex post* second-guessing. Accordingly, the Court holds that a significant gap exists when coverage is excluded or limited for certain types of conditions or treatments, when viewed, at the time of election, in light of the benefits offered, preexisting condition exclusions, and the treatment the beneficiary may foreseeably require.

### b. *Was There a Significant Gap?*

The Court must determine, therefore, whether Defendants could reasonably have expected a significant gap to result in Plaintiffs' insurance coverage at the time Schlett was converted to part-time status and lost her benefits. In so doing, the Court views the policies as if a choice had to be made in January, 1994, with Schlett knowing that she was pregnant, but not expecting complications or knowing her future medical costs. So viewed, there is no significant gap in the policies. Both policies covered the medical conditions here involved. The coinsurance limits here at issue do not become relevant until medical bills exceed $33,000, far more than the expected cost of the childbirth. And when the cost of premiums is included in the calculus, the numerical gap disappears almost entirely. It could not be said at the time of COBRA coverage election that there was a significant gap in the two coverages.

### 3. *Exclusion for Preexisting Conditions*

■ Plaintiffs also allege that they are entitled to continuation coverage on the ground that Mr. Schlett's preexisting plan contained a preexisting conditions limitation, despite the fact that the limitation did not in any way reduce the benefits payable under the plan on the facts of this case. They argue that since the statute at issue terminates the right to continuation coverage only when the employee becomes covered under another "group health plan which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary," 29 U.S.C. § 1162(2)(D)(i), that a group health plan with preexisting conditions limitations can never satisfy the demands of the statute, even when the beneficiary's actual medical expenses are covered under the other plan. Plaintiffs' overly literal interpretation of the statutory language flies in the face of both Congressional purpose and com-

mon sense. If the Court were to adopt such a rule, virtually no private health plan would pass muster. Congress' clear intent in passing the statute was to avoid significant gaps in health coverage. The Court notes further that the exclusion, under the statutory language, must relate to a preexisting condition *of the beneficiary;* properly understood, the statute describes only specific instances of preexisting conditions exclusions, not preexisting conditions exclusions in general. The Court holds that before a preexisting conditions exclusion creates a right to continuation coverage, it must exclude or limit coverage for the types of condition or treatment for which the employee requires coverage.

### 4. *Summary*

Plaintiffs have failed to establish that they are entitled to continuation coverage under the COBRA amendments to ERISA. Accordingly, Defendants' motion for summary judgment on Counts III and IV must be granted.

### D. *Promissory Estoppel*

Plaintiffs have stipulated to dismissal of their state promissory estoppel claim on grounds of federal preemption. Accordingly, Defendants' motion for summary judgment on Count V will be granted.

### E. *Intentional Interference with ERISA Benefits*

Plaintiffs allege that Defendants' decision to reduce Schlett to part-time status was motivated by a desire to interfere with her ERISA benefits. It is unlawful to discharge or discriminate against an employee for the purpose of interfering with the attainment of any right to which she may become entitled under an ERISA plan. 29 U.S.C. § 1140. A plaintiff states a cognizable claim for intentional interference with ERISA benefits when she alleges that her employer discharged her for the purpose of depriving her of continued participation in her employer's company-provided health plan. *Fitzgerald v. Codex Corp.,* 882 F.2d 586, 588–89 (1st Cir.1989); *Kross v. Western Elec. Co., Inc.,* 701 F.2d 1238, 1243 (7th Cir.1983). In order to prevail on such a claim, she must show

that her employer had a specific intent to violate ERISA. She need not show that the employer's sole purpose in discharging her was to interfere with her health benefits, but must show that denial of benefits was a motivating factor in the decision. *See Humphreys v. Bellaire Corp.,* 966 F.2d 1037, 1043 (6th Cir.1992).

To evaluate whether an employer has intentionally interfered with an employee's ERISA benefits, the Court uses an approach similar to that which the Court uses in evaluating discrimination claims. The employee can meet her burden of establishing a prima facie case by presenting either direct or circumstantial evidence of intentional interference with her ERISA rights. To establish her prima facie case by circumstantial evidence, she must show (1) that she was covered under the employer's plan; (2) that she was subjected to adverse employment action; (3) that she was meeting her employer's reasonable expectations; and (4) that she was discharged under circumstances that provide some basis for believing that the prohibited intent was present. The burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the adverse action. Once the employer has met its burden, the burden shifts back to the employee to show that the employer's stated reason for the adverse action is pretextual.

As with Plaintiffs' discrimination claim, the intentional interference issue here centers on the fourth prong of the test. Plaintiffs allege they have shown a triable issue of fact exists on the intentional interference claim because (a) district manager Shake asked Schlett if she intended for Avco to pay for her pregnancy, and (b) Schlett's reduction to part-time status came in close proximity to the birth of her child. They offer no other evidence in support of this claim.

Plaintiffs have not presented sufficient evidence from which a reasonable jury could find that Defendants' termination of Schlett was motivated by a desire to cut off her health benefits. The Court has already found, *supra,* that Shake's inquiry about Schlett's health benefits did not evince dis-

criminatory animus. The proximity of Schlett's reduction to part-time status to the birth of her child is not enough, standing alone, to overcome a motion for summary judgment. Mere proximity to benefits is not sufficient *per se* to create an genuine issue of fact, particularly when the employer has presented a separate, legitimate reason for the reduction in hours. *See Humphreys*, 966 F.2d at 1044. Accordingly, Defendants' motion for summary judgment on Count VI must be granted.

### F. Family and Medical Leave Act

Finally, Plaintiffs allege that Defendants violated the Family and Medical Leave Act by cutting off her medical insurance, denying her right to twelve weeks of leave, and terminating her while she was unable to return to work due to the birth of her son. Defendants have moved for summary judgment that FMLA does not cover Schlett for two separate reasons: (1) Schlett had been employed by Avco for fewer than twelve months before her leave commenced; and (2) Avco did not employ fifty or more employees within seventy-five miles of Schlett's worksite.

In order to be covered by FMLA, an employee must have been employed "for at least 12 months by the employer with respect to whom leave is requested." 29 U.S.C. § 2611(2)(A)(i). For purposes of FMLA, Schlett was employed by Avco from March 24, 1993 to February 17, 1994, a period of ten months and three weeks. Thus, Schlett does not satisfy the minimum length of service requirements for FMLA coverage.

Also, if the employer employs fewer than fifty employees within seventy-five miles of the worksite, FMLA does not cover the employee. 29 U.S.C. § 2611(2)(B)(ii). Avco employs fewer than fifty employees within seventy-five miles of its Sandusky, Ohio office. Schlett is excluded from FMLA coverage on this ground as well.

Despite the fact that Schlett is excluded from FMLA coverage under the plain language of the statute, Plaintiffs argue that Defendants are estopped from denying eligibility because Avco failed to notify Schlett that she was not eligible for FMLA leave. The FMLA Regulation regarding notification in February, 1994, when Schlett applied for leave, provided that "if an employee notifies an employer of need for FMLA leave before the employee meets [the twelve-month] eligibility criteri[on], the employer ... may advise the employee when the eligibility requirement is met." 29 C.F.R. § 825.110(d) (1994). That regulation was subsequently changed, effective February, 1995, to require the employer to give notice of an employee's ineligibility. "Where the employee does not give notice of the need for leave more than two business days prior to commencing leave, the employee will be deemed to be eligible if the employer fails to advise the employee that the employee is not eligible within two business days of receiving the employee's notice." 29 C.F.R. § 825.110(d) (1995). Plaintiffs urge the Court to apply the current Regulation to this case, and hold that Schlett is eligible for leave because of Avco's failure to notify her otherwise.

Plaintiffs' argument suffers from two fatal flaws. First, the amended 1995 Regulation is not retroactive. *Robbins v. Bureau of Nat'l Affairs, Inc.*, 896 F.Supp. 18 (D.D.C. 1995). Second, even if the 1995 Regulation applied retroactively, it would estop Defendants from raising only their first defense to FMLA coverage; their defense that Avco employs fewer than fifty employees within seventy-five miles of the Sandusky office remains valid. Schlett has not shown that she is entitled to protection under the Family and Medical Leave Act. Accordingly, Defendants' motion for summary judgment on Count VII must be granted.

### III. Conclusion

For the foregoing reasons, Defendants have shown that no material issue of fact exists and that they must prevail as a matter of law. Defendants' motion for summary judgment is granted. Plaintiffs' motion for partial summary judgment is denied.

IT IS SO ORDERED.