# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 96-2285

———————

Bonnie L. Geissal, as beneficiary  *
and representative of the Estate  *
of James W. Geissal, deceased,  *
individually and in a  *
representative capacity on behalf  *
of the Group Benefit Program of  *
Moore Medical Corp.,     * Appeal from the United States
         * District Court for the
    Plaintiff - Appellant,  * Eastern District of Missouri.
         *
  v.         *
         *
Moore Medical Corporation; Group  *
Benefit Plan of Moore Medical  *
Corp.; Herbert Walker,    *
         *
    Defendants -
Appellees.

———————

        Submitted:  December 11, 1996
            Filed: June 10, 1997

———————

Before FAGG, FLOYD R. GIBSON, and LOKEN, Circuit Judges.

———————

FLOYD R. GIBSON, Circuit Judge.

  James Geissal filed this suit against his former employer, its group health plan, and the plan administrator (collectively the "Plan"), claiming primarily that the Plan violated certain portions of the Comprehensive Omnibus Budget Reconciliation Act of

1986 ("COBRA"), as amended, see 29 U.S.C. §§ 1161-1169 (1994), when it rejected his efforts to obtain continuation insurance benefits following the termination of his employment. On motion for partial summary judgment, the district court[1] determined that Geissal, who at the time of his discharge was also insured under a group health plan sponsored by his wife's employer, was not entitled to take advantage of the continuation coverage mandated by COBRA. The district court also concluded the record does not support Geissal's assertion that the Plan should be equitably estopped from denying him COBRA benefits. Bonnie Geissal, who was substituted as plaintiff upon James Geissal's death, appeals the district court's decision, and we affirm.

## I.  BACKGROUND

When Moore Medical Corporation ("Moore") fired James Geissal[2] on July 16, 1993, he had been employed by the company for a little over seven years. During his tenure with Moore, James, who suffered from cancer, participated in the group health plan the corporation offered to its employees. See 29 U.S.C. § 1167(1) (1994) (defining "group health plan" for purposes of COBRA's continuation requirements). At the same time, James was a beneficiary under a plan provided by his wife's employer, Trans World Airlines ("TWA"), through Aetna Life Insurance Company ("Aetna"). Put simply, then, James enjoyed "dual coverage" before he lost his job.

In an affidavit submitted to the district court, James stated that he was unhappy about the circumstances surrounding his termination and even requested, pursuant to

---

[1]The HONORABLE DAVID D. NOCE, United States Magistrate Judge for the Eastern District of Missouri, who presided over the case with the consent of the parties in accordance with 28 U.S.C. § 636(c) (1994).

[2]For ease of discussion, throughout the remainder of this opinion we often identify James Geissal by his given name, "James." We use the surname "Geissal" to refer to the appellant, Bonnie Geissal.

Missouri law, a "service letter" from Moore detailing the grounds for his discharge.[3] According to the affidavit, though, James ultimately declined to "consult with an attorney to investigate and to determine what rights and claims [he] might have [had] against Moore," Geissal's App. at 23, because Moore promised to afford him an opportunity under COBRA to maintain his health insurance. James further claimed that, based on these assurances, he failed to locate an alternative policy to supplement the insurance he received from his wife's employer.

After receiving an "election form" outlining his COBRA rights, James chose to receive continued coverage under Moore's group health plan. As such, James made premium payments, which Moore accepted, for approximately six months after his last day of work. Nonetheless, by letter dated January 27, 1994, the plan administrator informed James that he was ineligible for COBRA benefits because he was already covered under TWA's group policy. As a result, the insurer declared its intention to reimburse James for the premiums he had tendered, and it also returned billings that had been submitted by the cancer patient's medical care providers.

James subsequently initiated this suit, principally asserting that the Plan violated COBRA when it canceled his insurance coverage. Following limited discovery, James moved for summary judgment against the Plan on counts one and two of his four count Complaint. The district court denied James's motion and instead entered summary judgment in the Plan's favor on the two causes of action. See Geissal v. Moore Med. Corp., 927 F. Supp. 352, 361 (E.D. Mo. 1996) (citing Madewell v. Downs, 68 F.3d 1030, 1048-50 (8th Cir. 1995) (recognizing a district court's prerogative to grant summary judgment sua sponte where the party against whom judgment will be entered

_____

[3]The Missouri legislature requires certain corporate employers, upon request and under statutorily prescribed circumstances, to furnish disassociated employees a signed writing "truly stating for what cause, if any, such employee was discharged." Mo. Ann. Stat. § 290.140 (West 1993).

has received adequate notice and an opportunity to respond)). In particular, the court decided that COBRA does not, in most cases, compel an employer to furnish continuation benefits to a discharged employee when the individual is also insured under another group plan. See id. at 358-60. The court additionally determined that James had not proffered facts sufficient to substantiate his claim for equitable estoppel. See id. at 360-61. Consequently, the court dismissed counts one and two, but ordered additional proceedings relating to the remaining grounds for relief. Bonnie Geissal, who by this time had replaced her husband as plaintiff, petitioned the court to make appropriate findings under Rule 54(b) of the Federal Rules of Civil Procedure, thus permitting an immediate appeal from the partial grant of summary judgment. The Plan did not challenge the motion, and the court granted Geissal's request by entering final judgment on counts one and two and staying further action pending our resolution of this interlocutory appeal.[4]

## II. DISCUSSION

### A. COBRA

The "staggering budget deficits now facing the United States" prompted Congress to pass COBRA in 1986. S. Rep. No. 99-146, at 3 (1985), reprinted in 1986 U.S.C.C.A.N. 42, 43. Ever resourceful, Congress also used this massive piece of legislation as a vehicle to assuage its concern with "the growing number of Americans without any health insurance coverage and the decreasing willingness of our Nation's hospitals to provide care to those who cannot afford to pay." H.R. Rep. No. 99-241,

---

[4]Dubious of our jurisdiction, we instructed the parties to approach oral argument prepared to discuss the possible prematurity of this appeal. Though we regard this as an extremely close case, we are satisfied that the district court acted within its discretion when it authorized Rule 54(b) certification as to counts one and two of Geissal's four count Complaint. See Hardie v. Cotter & Co., 819 F.2d 181, 182 (8th Cir. 1987)(reciting the standards applicable to entries of judgment under Rule 54(b)).

pt. 1, at 44 (1985), reprinted in 1986 U.S.C.C.A.N. 579, 622.  Namely, Congress included within COBRA amendments to the Employee Retirement Income Security Act of 1974 ("ERISA"), see 29 U.S.C. §§ 1001-1461 (1994), which require sponsors of group health plans to extend temporary continuation insurance benefits to individuals who lose coverage due to certain qualifying events, see 29 U.S.C. § 1161(a).

Normally, "qualified beneficiar[ies]," including employees and their spouses and dependents, id. § 1167(3)(A), are entitled to receive continuation coverage for eighteen or thirty-six months, depending upon the nature of the qualifying event, see id. § 1162(2)(A).  Aware that this lingering obligation could prove burdensome to group health plans, however, Congress enacted exceptions that permit earlier termination of benefits if certain conditions are met.  See id. § 1162(2)(B)-(E).  Of present concern is the provision allowing cancellation of COBRA insurance on

> [t]he date on which the qualified beneficiary first becomes, after the date of the election [to obtain continuation benefits]--
>
> (i) covered under any other group health plan (as an employee or otherwise) which does not contain any exclusion or limitation with respect to any preexisting condition of such beneficiary . . . .

Id. § 1162(2)(D).[5]

The Plan banks on this language to support its decision to terminate James Geissal's coverage.  Because James was a beneficiary under his wife's group health program with TWA, the Plan claims this statutory exception rendered it perfectly permissible to declare him ineligible for continuation benefits.  Though Geissal does

---

[5]In the course of this opinion, we cite to the version of the statute applicable to the facts of this case.  Cf. 29 U.S.C.A. §§ 1162(2)(D)(i), 1181-1191c (Supp. 1997) (containing recent amendments).

not deny that the TWA plan, administered through Aetna, constituted group health insurance which did not "contain any exclusion or limitation with respect to any preexisting condition," id. § 1162(2)(D)(i), she insists that the Plan violated COBRA when it canceled James's insurance. Purportedly seizing upon the "plain language" of the Act, Geissal contends that a person is disqualified from receiving continuation benefits only if he procures other coverage after he has chosen to secure COBRA insurance; otherwise, the individual does not first become covered "under any other group health plan" after the date of election. Under this reading of the exception, James retained his eligibility for continuation coverage because his status as a beneficiary under the TWA plan predated his discharge from Moore.

Geissal's interpretation of COBRA is not without supportive authority. The United States Court of Appeals for the Tenth Circuit, the first federal appellate tribunal to consider this question, has held that the exception allows termination of continuation benefits only if the beneficiary obtains other insurance after the date of election. See Oakley v. City of Longmont, 890 F.2d 1128, 1133 (10th Cir. 1989), cert. denied, 494 U.S. 1082 (1990).[6] Scrutinizing the disputed language "in light of the entire legislative scheme" enacted by Congress, id. at 1132-33, the Tenth Circuit concluded that the statute "contemplates continuation coverage to remain available to the covered employee despite a spouse's preexisting insurance policy," id. at 1133. The court explained:

> When we read the [exception's] introductory language in conjunction with "covered under any other group health plan (as an employee or otherwise)," we believe the plain meaning of this subsection cannot be construed to include a spouse's preexisting group plan as a condition to

---

[6]A public employee was the plaintiff in Oakley, and the case thus arose under the Public Health Service Act rather than ERISA. The pertinent continuation coverage provisions in the two Acts are, for practical purposes, indistinguishable. Compare 42 U.S.C. §§ 300bb-1 to -8 (1994) with 29 U.S.C. §§ 1161-1169.

terminate continuation coverage. Indeed, [the appellant] did not "first become" covered under his wife's policy after the qualifying event that resulted in his termination from the City's employment. Nor did Congress intend a covered employee's termination to become a condition triggering "other" coverage under a spouse's preexisting group plan. Consequently, only when we read the language of subsection (i) to refer to other coverage occurring after the qualifying event, do we preserve its plain meaning and give effect to Congress' intent.

Id. at 1132 (quoting 42 U.S.C. § 300bb-2(2)(D)(i)).

More recently, a panel of the Seventh Circuit, with one judge dissenting, reached the same result, but for slightly different reasons. See Lutheran Hosp., Inc. v. Business Men's Assurance Co. of Am., 51 F.3d 1308, 1312-13 (7th Cir. 1995). That court focused upon what it perceived to be Congressional intent to grant a displaced employee the opportunity to maintain his insurance "status quo." See id. The court in large part divined this motivation from the requirement that continuation coverage be "identical to the coverage provide[d] under the plan to similarly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred." Id. at 1313 (quoting 29 U.S.C. § 1162(1))(alteration added). Where an individual is fortunate enough to possess dual coverage before the occurrence of a qualifying event, he will receive "identical" benefits after the event, and thereby preserve his health care status quo, only if given an opportunity to invoke COBRA continuation rights. See id. at 1312-13. Elaborating upon this theme, and accentuating its conception of the statute's "plain language," the court observed:

The statute clearly provides that the employee's right to continuation coverage terminates only when he or she first becomes, after the election date, covered by any other group health plan. The statute does not say that an employee is ineligible for continuation coverage if he or she is covered by a preexisting group health plan. . . . Therefore, an employee

loses the right to continuation coverage only if he or she chooses after the election date to accept coverage under another group health plan.

* * *

The plain language of the statute dictates that an individual only loses COBRA eligibility if he or she chooses to accept alternative group health insurance after the qualifying event. By the terms of the statute, the individual has the choice whether to preserve the status quo and continue the prior level of coverage under COBRA or accept alternative coverage and discontinue COBRA. In either case, for the [mandatory] statutory period . . ., the individual is never forced to accept a lower level of health care coverage than he or she received as an employee before the qualifying event.

Id. at 1312; see also King v. John Hancock Mut. Life Ins. Co., 500 N.W.2d 619, 621-23 (S.D. 1993) (adopting parallel interpretation of comparable COBRA exception).

The opinions of two other courts of appeals stand in direct contradiction to Lutheran Hosp. and Oakley. See National Cos. Health Benefit Plan v. St. Joseph's Hosp., Inc., 929 F.2d 1558 (11th Cir. 1991); Brock v. Primedica, Inc., 904 F.2d 295 (5th Cir. 1990). These tribunals have emphasized that Congress designed COBRA to provide security for those persons who, as a result of some disruption in their employment, are left without any health insurance. See National Cos., 929 F.2d at 1569-70; Brock, 904 F.2d at 296. The continuation coverage compelled by COBRA offers limited relief to these individuals by granting them a reasonable amount of time to procure alternative insurance. See National Cos., 929 F.2d at 1570. Once a person does, indeed, become a beneficiary under another group health plan, the result desired by Congress is achieved, and continuation coverage becomes unnecessary and superfluous. See id. In recognition of this fact, the exception at issue allows an employer to cancel continuation coverage whenever an employee receiving those benefits obtains replacement insurance. See id. As viewed by the Eleventh Circuit, the

-8-

provision "clearly includes employees covered under their spouses' preexisting group health plans. In such a setting, the concerns that motivated Congress' enactment of COBRA generally are not present; the employee has group health coverage." Id.

The Eleventh Circuit also rejected the notion that the statute's "plain language" commands a different result. Chief Judge Tjoflat, writing for the court, reasoned:

> Congress was concerned with the lack of group health coverage after an employee left his job; therefore, the relevant time period is that following his continuation-coverage election. In applying the termination provision at issue, then, it is clearly irrelevant whether an employee had other group health coverage prior to this election date -- an employer cannot refuse to offer continuation coverage to a former employee simply because that ex-employee had other group health coverage during his employment. Instead, Congress allowed ERISA-plan sponsors to terminate continuation coverage only on the first date after the election date that the employee became covered under another group health plan. Thus, it is immaterial when the employee acquires other group health coverage; the only relevant question is when, after the election date, does that other coverage take effect. In the case of an employee covered by preexisting group health coverage, the terminating event occurs immediately; the first time after the election date that the employee becomes covered by a group health plan other than the employer's plan is the moment after the election date. In effect, such an employee is ineligible for continuation coverage.

Id. Based on this analysis, the Eleventh Circuit held that an employee who is insured under another group health plan may opt for continuation benefits only if "there is a significant gap between the coverage afforded under his employer's plan and his preexisting plan." Id. at 1571. The existence of a significant gap in coverage gives rise to continuation rights because in that situation "the employee is not truly 'covered' by the preexisting group health plan." Id.

In dicta, we have previously described as "attractive" the position announced by the Eleventh Circuit on this issue, see McGee v. Funderburg, 17 F.3d 1122, 1124 (8th Cir. 1994), but in McGee we gave "greater significance [to] the definition of 'cover[age] under any other group health plan,'" id. We do, however, take this occasion to explicitly follow the approach adopted by the Eleventh Circuit.[7] Having comprehensively reviewed both the language of the relevant exception and its function within the larger framework of COBRA, along with what little legislative history is available to shed light on the subject, we find ourselves in disagreement with the Seventh Circuit's decision that continuation benefits were crafted to allow an individual to maintain his insurance "status quo." See Lutheran Hosp., 51 F.3d at 1312-13. Rather, we are convinced that Congress was fundamentally interested in making affordable health care temporarily available to those who otherwise would find themselves "without any health insurance coverage."[8] H.R. Rep. No. 99-241, pt. 1, at 44 (1985), reprinted in 1986 U.S.C.C.A.N. 579, 622. Consistent with this goal, COBRA confers upon displaced employees a chance to locate replacement insurance without suffering any lapse in coverage, but it also allows employers to cancel continuation benefits whenever the purpose underlying the statute is served. Specifically, COBRA authorizes the termination of continuation coverage on the day that a former employee becomes a beneficiary under "any other group health plan," 29 U.S.C. § 1162(2)(D)(i), and we think it is largely irrelevant under the Act whether the

---

[7]Though the effective statutory language in National Cos. predated the 1989 amendments to COBRA, which are operative in the present appeal, this circumstance does not make the Eleventh Circuit's viewpoint any less appealing. Cf. Teweleit v. Hartford Life & Accident Ins. Co., 43 F.3d 1005, 1010 (5th Cir. 1995)("The [1989] amendment did not change existing law but clarified and emphasized the original Congressional intent behind COBRA.").

[8]Of course, to the extent a person has no group health insurance independent of that required by COBRA, the statute does offer him the right to preserve the status quo of his health insurance. See Lutheran Hosp., 51 F.3d at 1317 (Coffey, J., dissenting).

employee obtained that coverage before or after his COBRA rights are activated.[9]   Cf. Lutheran Hosp., 51 F.3d at 1315 (Coffey, J., dissenting)("The goal of COBRA . . . is to provide temporary health insurance to those people whose jobs are voluntarily or involuntarily terminated, and are without health insurance other than COBRA coverage. COBRA insurance is not, nor has it ever been intended to provide adjunct or double health insurance coverage for those who are covered under another pre-existing policy.")

     To be sure, the exception under discussion permits early cancellation of benefits only when the employee "first becomes, after the date of the election," 29 U.S.C. § 1162(2)(D), covered under any other group health plan.  Like the Eleventh Circuit, though, we do not consider this clause to be an impediment to the conclusion we reach today.  The quoted language was not meant to absolutely insulate from the exception persons who enjoy preexisting insurance, but was merely intended to pinpoint the day on which the presence of that coverage becomes pertinent.  In other words, it is only after the election date that an employee's status as a beneficiary under another group health plan will permit the termination of COBRA benefits.  See National Cos., 929 F.2d at 1570 ("[I]t is immaterial when the employee acquires other group health

_____

[9]In reaching an opposite result, both the Seventh and Tenth Circuits relied, in varying degrees, upon COBRA's instruction that continuation benefits be "identical to the coverage provided under the [employer's] plan to similarly situated beneficiaries under the plan."  29 U.S.C. § 1162(1); see Lutheran Hosp., 51 F.3d at 1313; Oakley, 890 F.2d at 1133.  With respect, we fail to see how this requirement, which prevents an employer from offering less favorable insurance to subscribers who invoke their continuation rights, impacts COBRA's termination clauses.  True, continuation coverage must be indistinguishable from the insurance offered to other plan beneficiaries, but an employer is still allowed to cancel this coverage whenever a recipient of continuation benefits becomes "covered under any other group health plan." 29 U.S.C. § 1162(2)(D)(i); see also Lutheran Hosp., 51 F.3d at 1317 n.4 (Coffey, J., dissenting)(questioning the Seventh Circuit's reliance on the "identical coverage" requirement).

coverage; the only relevant question is when, after the election date, does that other coverage take effect.").  To use this case as an example, the first time, after the date of election, that James Geissal became covered under his wife's plan with TWA was the very moment after the election date. As a consequence, it was well within Moore's rights to cancel James's COBRA benefits unless there was "a significant gap between the coverage afforded under [Moore's] plan and his preexisting plan." Id. at 1571.  It is now incumbent upon us to decide whether such a significant gap was, in fact, present.[10]

In ascertaining the existence of a significant gap in coverage, our first order of business is to determine what considerations should guide this inquiry.  Immediately following the inception of the "gap" test, courts tended to evaluate the issue by fixating upon the actual expenses incurred by the employee as a result of the COBRA cancellation.  See, e.g., McGee, 17 F.3d at 1126 (mentioning, in dicta, that over $6,500 in personal liability caused by termination of COBRA benefits would constitute a significant gap); National Cos., 929 F.2d at 1571 (explaining that a significant gap would occur where an employee, "despite his other coverage, will be liable personally for substantial medical expenses to his and his family's detriment").  With the passage of time, however, this methodology has been criticized as representative of an

---

[10]The significant gap test finds at least implicit support in the legislative history accompanying the 1989 amendments to ERISA.  In that year, Congress clarified that an employee who obtains insurance under another group health plan is nonetheless entitled to continuation benefits if his additional coverage "contain[s] any exclusion or limitation with respect to any preexisting condition of such beneficiary."  29 U.S.C. § 1162(2)(D)(i).  The House Ways and Means Committee reported that this extra language was tailored to effectuate the purpose of continuation coverage, "which was to reduce the extent to which certain events, such as the loss of one's job, could create a significant gap in health coverage."  H.R. Rep. No. 101-247, at 145 (1989) (emphasis added), reprinted in 1989 U.S.C.C.A.N. 1906, 2923.  One example of a gap in coverage "occurs when the new employer group health coverage excludes or limits coverage for a preexisting condition that is covered by the continuation coverage."  Id.

inappropriate <u>post hoc</u> determination which gives too little guidance to employers who must decide, on the front end, whether termination of COBRA benefits is warranted.  See, e.g., <u>Lutheran Hosp.</u>, 51 F.3d at 1317 (Coffey, J., dissenting)("Both the district court and the majority agree that we should not engage in <u>post hoc</u> determinations of insurance policies and their coverage.  Rather, the policies must be assessed at the time that a person has the right to elect COBRA benefits because of termination of employment."); <u>Schlett v. Avco Fin. Servs., Inc.</u>, 950 F. Supp. 823, 833 (N.D. Ohio 1996)("The <u>post hoc</u> position advocated by Plaintiffs . . . subjects the employer to an unacceptable degree of uncertainty as to its legal obligations."); <u>Taylor v. Kawneer Co. Comprehensive Med. Expense Plan for Salaried Employees</u>, 898 F. Supp. 667, 677 (W.D. Ark. 1995)("[W]e . . . have serious doubts that the mere existence of financial liability for medical expenses in and of itself qualifies as a significant gap in coverage.").

Upon reflection, and with the benefit of several years of case law developing the relevant standard, we agree that placing primary significance upon an employee's actual expenses is unhelpful to those who must administer ERISA plans and does not adequately encompass other factors which have greater bearing on the presence of a significant gap. Therefore, we eschew this analysis in favor of a framework which, in our opinion, is less dependent upon hindsight and more responsive to the concerns which motivated Congress to enact COBRA.  We believe a district court confronted with this question should measure the gap by comparing the policies' provisions in light of information available to the employer on the day of the COBRA election.  To adjudge whether a significant gap existed on that date, thus entitling the employee to continuation coverage, the court should examine the policies "to determine their benefits, whether there is any exclusion or limitation on the patient's preexisting condition, and with a view to the treatment the beneficiary may foreseeably require."  <u>Lutheran Hosp.</u>, 51 F.3d at 1318 (Coffey, J., dissenting)(quotation and emphasis omitted); <u>see also</u> <u>Schlett</u>, 950 F. Supp. at 833 ("[A] significant gap exists when coverage is excluded or limited for certain types of conditions or treatments, when

-13-

viewed, at the time of election, in light of the benefits offered, preexisting condition exclusions, and the treatment the beneficiary may foreseeably require.").

In this case, Geissal has failed to carry her burden of proving there was a significant gap between the Moore and TWA plans. Based on the record before us, it is impossible for us to conclude that, on the election date, the TWA plan offered appreciably fewer benefits, excluded claims for any of James's preexisting ailments, or limited coverage for treatment likely necessary for a cancer patient in James's condition. To the contrary, it appears that TWA's insurance, while not completely identical to the Moore plan, provided comprehensive medical benefits to employees and their eligible dependents. Indeed, Geissal has satisfactorily identified only two differences between the plans: TWA's yearly deductible was $350 greater than the annual deductible under Moore's program, and the two plans had separate lifetime maximums on benefits.[11] These rather insubstantial dissimilarities fall far short of the quantum of proof necessary to demonstrate a significant gap in coverage. Cf. Lutheran Hosp., 51 F.3d at 1318 (Coffey, J., dissenting)("With respect to any dollar caps on coverage (all that really is at issue here), the 'gap' (if any) must be significant enough to alert a reasonable person of the potential for substantial personal liability under the new plan, that does not exist under the old." (quotation omitted)). Because James was insured under a comparable group health program, the Plan did not violate COBRA when it deemed him ineligible for continuation benefits.

We offer one final comment before proceeding to the remaining issue in this appeal. As the preceding discussion all too clearly illustrates, the federal courts have experienced significant difficulty in attempting to grasp the true meaning of 29 U.S.C. § 1162(2)(D)(i). Our efforts, though unquestionably well intentioned, have inevitably led to at least two separate and irreconcilable interpretations of the law. This

---

[11]Curiously, the record does not contain copies of the respective insurance policies.

deepening rift is extremely troublesome to us, especially given the proliferation of group health plans and the importance of guaranteeing equivalent protection to all ERISA beneficiaries throughout this nation. Accordingly, we suggest that some definitive action, originating either from Congress or the Supreme Court, might be appropriate.

### B. Equitable Estoppel

Geissal also contends that the Plan is estopped from denying continuation coverage to James. For a considerable length of time, the availability in ERISA actions of this federal common law doctrine was an open question in our Circuit, see, e.g., Jensen v. SIPCO, Inc., 38 F.3d 945, 953 (8th Cir. 1994)("[W]e have left open the question whether equitable estoppel will ever give rise to an ERISA claim . . . ."), cert. denied, 115 S. Ct. 1428 (1995), but we recently confirmed that "[c]ourts may apply the doctrine of estoppel in ERISA cases only to interpret ambiguous plan terms," Fink v. Union Cent. Life Ins. Co., 94 F.3d 489, 492 (8th Cir. 1996). The seminal issue in this appeal involves the Plan's interpretation and application of COBRA's continuation coverage provisions, statutory terms which are automatically included within every ERISA plan. See 29 U.S.C. § 1161(a) ("The plan sponsor . . . shall provide . . . continuation coverage under the plan."). It is safe to say that reasonable persons could come to conflicting conclusions regarding the import of these COBRA provisions, as the meaning of the statute has fairly evenly divided the federal courts of appeals that have addressed the question. See National Cos., 929 F.2d at 1572 ("[T]he meaning and effect of COBRA's and the Tax Reform Act's amendments to ERISA is something about which reasonable persons can differ."). In the current appeal, then, Geissal challenges the Plan's interpretation of ambiguous components of an ERISA policy, and she has thus presented a cognizable claim of equitable estoppel. See id.

The principle of estoppel precludes a party from denying a representation upon which another person has reasonably and detrimentally relied. See Farley v. Benefit

Trust Life Ins. Co., 979 F.2d 653, 659 (8th Cir. 1992).  According to Geissal, the Plan assured James that he was entitled to continuation coverage, and he relied on the Plan's representations by neglecting to obtain other insurance and by choosing not to pursue various legal remedies against his former employer.  Geissal's claim founders, however, because she has not adverted to facts establishing that James's alleged reliance was detrimental.  To succeed on an equitable estoppel claim premised upon foregone insurance coverage, a plaintiff must demonstrate that alternative insurance was available.  See Smith v. Hartford Ins. Group, 6 F.3d 131, 137 (3d Cir. 1993)(deciding under similar circumstances that a party proves detrimental reliance by demonstrating that he could have obtained other insurance which covered his illness); cf. National Cos., 929 F.2d at 1574 (discerning detrimental reliance where the plaintiffs "had, in fact, found another insurance company willing to cover [the beneficiary's medical condition]").  Geissal has not made this showing, but has merely proffered a conclusory contention that James surely would have been able to purchase some supplemental policy.  This is insufficient to withstand summary judgment.  See Smith, 6 F.3d at 137.

Likewise, Geissal has not shown that James suffered a concrete injury attributable to his failure to seek legal redress based on the termination of his employment.  It is not enough to assert, as Geissal has, that James "felt Moore had been very unfair in discharging [him]," Geissal's App. at 23, and that he "gave some thought to whether [he] should consult with an attorney to investigate and to determine what rights and claims [he] might have [had] against Moore," id.  Instead, as an absolute minimum to overcome summary judgment, an estoppel plaintiff must  point to some facts which indicate that the lost causes of action were meritorious.  Geissal has not even begun to satisfy this burden, for the record before us is completely bereft of any materials detailing the nature of James's employment with Moore or the circumstances surrounding his discharge.  Consequently, because Geissal has not substantiated her allegations of detrimental reliance, we hold that the district court was correct in summarily dismissing the equitable estoppel claim.

## III. CONCLUSION

The Plan did not violate COBRA when it terminated James's continuation insurance coverage, and the record does not support Geissal's contention that the Plan should be equitably estopped from denying coverage. As such, we affirm the district court's entry of partial summary judgment for the Plan.

AFFIRMED.

A true copy.


Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.